516 So.2d 562 (1987)
Katie C. BELL and John P. Bell
v.
G. Rodney HART.
85-878.
Supreme Court of Alabama.
September 25, 1987.
Rehearing Denied November 6, 1987.
*563 Barry Hess and William B. Jackson II of Hess, Atchison & Horne, Mobile, for appellants.
W. Boyd Reeves, Edward C. Greene, and Richard E. Jesmonth of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for appellee.
PER CURIAM.
The issue on appeal is whether John Guy Fisher III, Phar.D. (pharmacist), and Howard Lee Miller, Ph.D. (psychologist), were competent to testify as expert witnesses concerning the correct dosage and effect of the anti-depressant drug Elavil. The trial court determined that they were not competent to testify and granted summary judgment in favor of a doctor who had been sued for malpractice. We affirm.

FACTS
On April 24, 1981, plaintiff Katie Bell went to Dr. G. Rodney Hart's office, complaining of headaches, weakness, insomnia, agitation, depression, and painful leg cramps. Bell had complained of these symptoms on prior visits to Dr. Hart's office. In view of the persistent nature of these problems, Dr. Hart had her admitted to Mobile Infirmary on April 24, 1981, for a complete medical evaluation.
Bell remained in the hospital for approximately two weeks. During this time, she underwent a thorough medical evaluation, which included examinations by vascular and neurological specialists, as well as tests of her liver, kidney, blood, muscle, and thyroid functions. After these tests, Dr. Hart was still unable to determine the source of her complaints, and on May 5, 1981, she was discharged from the hospital, at which time Dr. Hart prescribed Elavil, a tricyclic anti-depressant. She was to take the Elavil daily in a single 300-milligram dosage at bedtime. Dr. Hart hoped that the Elavil would eliminate her insomnia and the intense pain that she suffered as a consequence of leg cramps. She took the prescribed dosage on the first night she was home from the hospital, May 5, 1981. *564 On the morning of May 6, her husband, John Bell, telephoned Dr. Hart's office and informed his receptionist that his wife had been incoherent and confused following her ingestion of Elavil. The Bells were instructed to proceed to the Providence Hospital Emergency Room for treatment; instead Mrs. Bell went to the Mobile Infirmary Emergency Room, where her condition was monitored for several hours. Subsequently, she was discharged to her home under orders from Dr. Hart.
The following day, May 7, she returned to Dr. Hart's office. At this visit, she appeared to be agitated and upset, attributing her incoherence and confusion to her ingestion of Elavil. Dr. Hart discontinued her use of Elavil and advised her to return to his office in one week. She did not return as instructed, and within four months filed this suit.
In her suit, she and her husband alleged that Dr. Hart committed medical malpractice in connection with his care and treatment of her during April and May of 1981. Specifically, they alleged that Dr. Hart negligently prescribed Elavil for her, and that his malpractice was so egregious as to constitute wanton and reckless misconduct.
Dr. Hart answered the complaint by denying any negligence or other improper conduct in connection with his care and treatment of her. Before trial, he filed three motions for summary judgment, alleging that the Bells had failed to present expert medical testimony regarding his negligence. The trial court denied all of these motions. Prior to the selection of the jury at trial, however, Dr. Hart filed motions, in limine, seeking to exclude the testimony of John Fisher and Howard Miller, a pharmacist and a psychologist respectively, on the ground that they were not competent to testify as experts.
The Bells were relying on the testimony of these two experts to prove that Dr. Hart negligently prescribed Elavil for Katie Bell. The first of these experts, Fisher, received a B.S. degree in pharmacy in 1974, from Samford University. He completed a one-year pharmacy internship at the Veterans' Administration Hospital in Birmingham after graduation. In 1976, he graduated with a Doctor of Pharmacy degree from the University of Tennessee Center for Health Sciences. While earning his doctorate in pharmacy, Fisher had two to four quarters of classroom work primarily involving the use of drugs and their effect when used in various disease states, which is referred to as pharmacotherapeutics. In addition, he took a number of courses in pharmacokinetics, which is the study of how the body reacts to drugs once they are in the body.
Fisher testified in deposition that, after his graduation in 1976, he taught at the College of Community Health Sciences at the University of Alabama as an assistant professor of family medicine. He was also the head of the family medicine department in applied pharmacology. In this position, Fisher was a consultant in drug therapy for third- and fourth-year medical students and for the 30 family medicine residents in the College of Community Health Sciences. He made the rounds with these students as they saw their patients and acted as a consultant about "alternative methods of treatments, proper doses, and potential side effects."
Fisher is presently employed as the chief of clinical pharmacokinetic services at Druid City Hospital, Regional Medical Center, in Tuscaloosa. In this job Fisher consults with doctors on the staff regarding drug problems that are occurring in their patients. It is also his job to run a drug and toxicology laboratory at the hospital, to perform all of the drug screens that are done in the hospital, and to measure the quantities of various drugs in the blood and other parts of the body. Fisher is also an associate director of the Alabama Poison Center, and he has worked as a pharmacist in Tuscaloosa. Finally, Fisher testified that he has had occasion to study and review literature and treatises by experts and various professionals that examined the effect of certain prescriptive drugs, including what are generally referred to as tricyclic anti-depressants such as amitriptylene hydrochloride (Elavil).
The Bells wanted to use Howard Lee Miller as their second expert witness. Miller *565 had a bachelor's degree and a master's degree in psychology from Western Missouri University. He received a doctorate in external psychology from the University of Hawaii, and he obtained a post-doctoral degree in the basic medical sciences program at Western Missouri University School of Medicine. Additionally, Miller had an experimental pathology fellowship at the Institute of Pathology and received a master of public health degree from the School of Public Health at the University of Alabama in Birmingham. Miller testified in deposition that he has had occasions to take courses and to do research related to the prescription, use, dosage, and administration of various drugs under different circumstances. He has studied pharmacology, psychopharmacology, and toxicology. In addition, Miller has taught college level courses in psychopharmacology, which is related to the use, dosage, and administration of drugs and the effects of drugs upon individuals who have taken them under varying circumstances, including, but not limited to, psychiatric drugs that might affect the central nervous system. Miller testified that he had been a certified or licensed drug investigator for the Drug Enforcement Agency and that part of his responsibilities included doing research on drugs and their effects.
Miller has been a consultant to numerous mental health clinics, including the Alabama Bureau of Vocational Rehabilitation, the Ohio Bureau of Vocational Rehabilitation, the Lowndes County Health Department, the Northwest Alabama Rehabilitation Center, and the Muscle Shoals Mental Health Center. Part of his duties included consultation, diagnosis, and recommendations to doctors about clients or patients and the medications that they were taking. Miller further testified that his education, his clinical and professional experience, and his studies gave him the opportunity to consider, review, and ascertain the accepted standard of care in the medical community for the use, dosage, and administration of amitriptyline hydrochloride, or Elavil. In this connection, Miller testified that tricyclic anti-depressants formed a major subject of the consulting and teaching that he did in psychopharmacology, and that he had reviewed the primary literature and original research studies on these drugs and was familiar with them.
Both "experts" testified that Dr. Hart deviated from the accepted standard of care in the medical community for the prescription, dosage, and administration of the drug Elavil to plaintiff Katie Bell.
After reviewing the depositions of Fisher and Miller, the court granted Hart's motion in limine. Hart then filed a motion to have the court reconsider its order denying his third motion for summary judgment. The trial court granted the third motion for summary judgment. The Bells appeal from that judgment.
The first issue raised on appeal is whether the trial court erred when it excluded the testimony of Fisher and Miller on the ground that they were not competent to testify as to the standard of care within the medical community with respect to the use, dosage, and administration of Elavil.
The plaintiffs contend that the trial court erred when it determined that the only expert who can testify to the acceptable standard of care in the community, and whether someone has deviated from that standard of care, is a physician licensed to practice medicine. The Bells argue that a person who can show that he has the educational, clinical, and professional experience and the affiliations with the medical community that Fisher and Miller have is competent to testify in medical malpractice cases as an expert witness as to the acceptable standard of care in the medical community. Dr. Hart contends that, in medical malpractice cases, proof as to what is or is not proper practice, treatment, and procedure ordinarily can be established only by another physician, who is shown to be qualified. Dr. Hart argues that plaintiffs' "experts," a non-physician pharmacist and a non-physician psychologist, clearly were not competent to testify as to Dr. Hart's alleged deviation from the appropriate standard of care.
The standard of review in summary judgment cases is well established. Summary *566 judgment is proper only when the pleadings and affidavits submitted by the movant show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.; Bon Secour Fisheries, Inc. v. Barrentine, 408 So.2d 490 (Ala.1981). This rule must be considered in light of the scintilla evidence rule applicable in Alabama. Woods v. Commercial Contractors, Inc., 384 So.2d 1076 (Ala. 1980).
In the Alabama Medical Liability Act, §§ 6-5-480 through -488, Code of Alabama 1975, the legislature addressed liability of medical professionals in the context of patient-doctor relationships in all of its aspects, viz., tort and contract. Thomasson v. Diethelm, 457 So.2d 397 (Ala.1984).
"In performing professional services for a patient, a physician's ... duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case." Section 6-5-484(a), Code 1975. Generally, a plaintiff must offer expert medical testimony as to what is such reasonable care, diligence, and skill (what is and what is not proper medical treatment and procedure). Gilbert v. Campbell, 440 So.2d 1048 (Ala. 1983). There are two exceptions to the foregoing general rule that have been recognized. First, where the want of skill or lack of care is so apparent as to be within the comprehension of the average layman and thus requires only common knowledge and experience to understand, no expert medical testimony is necessary. Parrish v. Spink, 284 Ala. 263, 224 So.2d 621 (1969); Tuscaloosa Orthopedic Appliance Co. v. Wyatt, 460 So.2d 156 (Ala.1984). This exception has usually been applied under circumstances where the doctrine of res ipsa loquitur is applicable, or where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment. (See Rosemont, Inc. v. Marshall, 481 So.2d 1126, 1130 (Ala.1985)). The other exception to the general rule is where the plaintiff introduces a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice. Zills v. Brown, 382 So.2d 528 (Ala.1980).
This is an action brought under the Alabama Medical Liability Act. The defendant physician, in support of his motion for summary judgment, offered expert medical testimony as to the appropriate standard of care and expert medical opinions that his treatment of Mrs. Bell was not a deviation from that standard of care. To defeat the defendant's motion for summary judgment, it was then incumbent upon the Bells to establish by expert medical testimony the appropriate standard of care and a breach thereof by the defendant or to show that this case came within one of the two exceptions (Gilbert v. Campbell, 440 So.2d 1048 (Ala.1983); Rosemont, Inc. v. Marshall, supra) in order to create a genuine issue of material fact as to this essential element of their cause of action. Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986).
We are of the opinion that the trial court correctly excluded the testimony of Fisher and Miller on the ground that they were not competent to testify as experts on the standard of care of physicians in prescribing the drug Elavil.
The Bells contend that the fact that neither expert was a medical doctor does not disqualify him from testifying as to the accepted standard of care in the medical community if he can otherwise show that he is qualified to render such an opinion. They cite this Court's case of Wozny v. Godsil, 474 So.2d 1078, 1087 (Ala.1985), wherein this Court held as follows:
"[T]he prevalent and the modern view is to recognize the exception to the general rule, provided there is an adequate showing on the relevant criteria; that is, even if the defendant and the witness are of different schools of practice, the witness may nevertheless be competent to testify on those standards as to which the principles of the schools do or should concur, such as matters of diagnosis or the existence of a condition that should be recognized by any physician. Accord Ashburn v. Fox, 233 So.2d 840 (Fla.Dist.Ct. *567 App.1970), cert. dismissed, 242 So.2d 873 (Fla.1971). The cases discussed above also recognize situations in which an expert witness may be competent to testify where he is knowledgeable (by way of either study and training or experience) of the methods and standards of practice (i.e. skill, care, and diligence) exercised by practitioners of the defendant's school, particularly with respect to the diagnosis, treatment, etc., of the specific injury, illness, or ailment involved. We adopt this view, and we, therefore, cannot affirmatively state, as a matter of abstract law, that an osteopathic doctor can never, ipso facto, offer expert testimony in a malpractice case against a medical doctor, regardless of the experience, expertise, etc., of the osteopath or regardless of whether the two schools concur as to the standards and methods of treatment involved."
This Court did hold in Wozny, supra, that where a plaintiff can establish that his expert witness is knowledgeable, because of his educational background, his clinical training, or his professional experience, of the methods and standards of care exercised by medical practitioners, and particularly where there is a substantial overlap as to the standards and methods of treatment involved, then the witness is competent to testify.
The precise holding in Wozny was that the affidavit of an osteopathic practitioner in that case rendered summary judgment in favor of the defendant-orthopaedic surgeon improper, this Court noting that the affidavit demonstrated that the standard of care with regard to osteopathic treatment and that of orthopaedic surgery were similar as they related to the care and treatment of the injury sustained by plaintiff. The Court also recognized that the practice of osteopathy was the practice of medicine. Code 1975, § 34-24-50.
Appellant also cites Police & Firemen's Ins. Ass'n v. Mullins, 260 Ala. 173, 69 So.2d 261 (1953), wherein this Court addressed the qualifications and competence of the medical testimony of a person other than a doctor, and wrote:
"It is also argued that error prevailed in permitting Associate Toxicologist Brooks to testify as an expert as to the symptoms of CO poisoning. It is well recognized that the science of toxicology, among other things, treats of poisons and their effects and their treatment and recognition. The witness was shown to have had extensive training and wide experience in this field. His testimony disclosed he was fully conversant with the subject and was therefore properly admitted. It is not the law that only a medical doctor may testify as to physical symptoms on the human being. If the witness is shown to have special qualification in that particular field and knowledge of the subject beyond that of the average laymen so as to give reliable testimony, he is not disqualified. Blakeney v. Alabama Power Co., 222 Ala. 394, 133 So. 16 [(1931)]; Hicks v. State, 247 Ala. 439, 25 So.2d 139 [(1946)]." (Emphasis added.)
260 Ala. at 178-79, 69 So.2d at 266.
This, of course, is a correct statement of the law; however, we believe that the holding in Mullins is narrower than appellant suggests and does not apply in the context of a medical malpractice case. In Mullins, a state toxicologist was allowed to testify as an expert with regard to the symptoms of carbon monoxide poisoning and whether the victim died as a result of an accidental carbon monoxide poisoning or from natural causes. Medical malpractice in the prescribing of drugs was not an issue there, and the competence of a toxicologist to testify in a medical malpractice case was not involved in that case.
Appellants also cite Dimoff v. Maitre, 432 So.2d 1225 (Ala.1983). There, this Court examined the question of whether a certified dental laboratory technician was competent to testify as to whether a dentist had deviated from the standard of care in the dental community when he prepared and took impressions of the plaintiff in order to construct crowns and bridges. In holding that the affidavit of the dental laboratory technician was sufficient to raise an issue of fact for purposes of getting to a jury, this Court wrote:

*568 "The issue to be determined on this appeal is whether, for the purpose of opposing a summary judgment motion, Robinson's affidavit raises a genuine issue as to any material fact or shows that Dr. Maitre is not entitled to judgment as a matter of law. Rule 56(c), Ala.R.Civ.P.
"Dr. Maitre contends that he is entitled to summary judgment because no competent expert testimony was offered to contradict his affidavit negating the allegations of the complaint. Liner v. Temple, 373 So.2d 638 (Ala.1979). He states that, as a general rule, in medical malpractice cases, proof as to what is or is not proper practice, treatment, and procedure can be established only by expert medical evidence. This statement is taken from Underwood v. Holy Name of Jesus Hospital, 289 Ala. 216, 266 So.2d 773 (1972), and Parrish v. Spink, 284 Ala. 263, 224 So.2d 621 (1969); Tant v. Women's Clinic, 382 So.2d 1120 (Ala.1980), contains a different statement of the same rule. Dr. Maitre argues that, because Robinson is not a dentist, his affidavit does not present competent expert testimony within the meaning of the above rule.
"An exception to the rule requiring testimony by a medical expert exists `in a case where want of skill or lack of care is so apparent ... as to be understood by a layman, and requires only common knowledge and experience to understand it....' Lloyd Noland Foundation, Inc. v. Harris, 295 Ala. 63, 66, 322 So.2d 709 (1975); Parrish v. Spink, 284 Ala. 263, 224 So.2d 621 (1969). Robinson's affidavit raises at least a scintilla of evidence that this would prove to be such a case once the facts were more fully developed. When there is a scintilla of evidence supporting the position of the party against whom summary judgment is sought, the motion should be denied. Allen v. Mobile Infirmary, 413 So.2d 1051 (Ala.1982); Parker v. King, 402 So.2d 877 (Ala.1981)."
432 So.2d at 1226-27.
The Dimoff case also can be distinguished from this case. In Dimoff, while finding summary judgment inappropriate, this Court opined:
"An exception to the rule requiring testimony by a medical expert exists `in a case where want of skill or lack of care is so apparent as to be understood by a layman, and requires only common knowledge and experience to understand it....' [The medical technician's] affidavit raises at least a scintilla of evidence that this will prove to be such a case once the facts are more fully developed."
432 So.2d at 1226-27, quoting Lloyd Noland Foundation, Inc. v. Harris, 295 Ala. 63, 66, 322 So.2d 709 (1975); Parrish v. Spink, 284 Ala. 263, 224 So.2d 621 (1969). The negligence attributed to Dr. Hart, unlike that attributed to Dr. Maitre in Dimoff, is not of such a nature as to be within the comprehension of a layperson. While a layperson quite conceivably could comprehend the standard of care applicable to the taking of dental impressions with a plaster-like substance, it is inconceivable that a layperson could comprehend the standard of care applicable to the prescription of Elavil.
We are of the opinion that this case is more like the case of Kriewitz v. Savoy Heating & Air Conditioning Co., 396 So. 2d 49 (Ala.1981), wherein the Court addressed a similar issue:
"Finally, the appellants contend that the trial court erred in refusing to allow two clinical psychologists to testify as to the cause of the appellants' condition. The psychologists were allowed to testify that the appellants had suffered brain damage and, in fact, one of the psychologists was permitted to state that Mr. Kriewitz had `organic brain syndrome.'
"What the psychologists were not allowed to express an opinion on was the medical causation of that condition. This is in line with Code 1975, § 34-26-1, ...
"* * *
"Thus, the trial court did not err in refusing to permit the psychologist to testify as an expert that in his opinion the physiological injury was caused by carbon monoxide poisoning."
The only case to which this Court has been cited, or which we have found by *569 independent research, regarding the question of whether a pharmacologist[1] is competent to testify as to whether the action of a medical doctor was negligent, is Rodriguez v. Jackson, 118 Ariz. 13, 574 P.2d 481 (Ct.App.1977). The Rodriguez case is remarkably similar to the case at issue. In that case, the plaintiff charged a medical doctor with malpractice as a result of his alleged deviation from the applicable standard of care in prescribing a drug for ingestion by plaintiff. Plaintiff did not offer the testimony of a physician that the defendant was negligent, but offered a witness who held a post-doctorate degree in pharmacology to testify as to the standard of care in the medical community. The trial court entered summary judgment for the defendant. The Arizona Court of Appeals affirmed the entry of summary judgment and in doing so wrote the following:
"[A] distinction must be made between testimony as to cause and testimony relative to the standard of care required of a physician. One need not necessarily be a medical doctor in order to testify as to causation.... However, appellant's witnesses were not competent to give an opinion as to whether the doctors were negligent. Unless the conduct complained of is readily ascertainable by laymen, the standard of care must be established by medical testimony. [Citations omitted.]"
118 Ariz. at 17, 574 P.2d at 485.
The question of whether a witness is qualified to render expert testimony is a question traditionally left to the sound discretion of the trial court, and the decision of the trial court will not be disturbed on appeal unless this Court finds that the trial court abused its discretion. Meadows v. Coca-Cola Bottling Inc., 392 So.2d 825 (Ala.1981). We cannot find that the trial court abused its discretion in excluding the testimony of the pharmacist as to whether a medical doctor was negligent.
In Lundgren v. Eustermann, 370 N.W.2d 877 (Minn.1985), the Supreme Court of Minnesota held that a psychologist was not competent to testify as to the standard of care obtaining in the medical community with regard to the use of prescription drugs. In so holding, the court stated:
"In this case the expert witness was not a physician but a psychologist. He has admirable qualifications as a psychologist, with extensive training and experience in the areas of psychology and pharmacology, including a doctorate in biopsychology. Dr. Rucker [the expert witness] has also done consulting work for drug companies engaged in research laboratory studies on the psychopharmacologic aspects of drug dependence. He has read books and journals, attended lectures, and trained graduate students, and he may well have the requisite scientific knowledge to testify about the nature of Thorazine, its dangers and use. What the witness lacks, however, is practical experience or knowledge of what physicians do. He himself has never prescribed Thorazine for a patient. It is one thing to study Thorazine in the laboratory and to discuss it in the classroom, but is quite another thing to prescribe the drug for a patient under the circumstances of a family medical practice. Dr. Rucker does not know how physicians themselves customarily use Thorazine in the treatment of their patients.... Clearly, plaintiff's expert [Dr. Rucker] does not have the practical knowledge and experience contemplated by the medical witness rule. We hold, as a matter of law, that Dr. Rucker was not competent to give an opinion on the standard of medical care required of Dr. Eustermann nor to give an opinion on whether Dr. Eustermann had departed from that standard, much less *570 to characterize a degree of that departure."
370 N.W.2d at 880-81 (emphasis added).
The qualifications of Dr. Rucker, as stated by the Minnesota court, bear a striking resemblance to Howard Lee Miller's qualifications in this case. The logic employed by the Minnesota court in reaching its conclusion that Dr. Rucker was not competent to testify is compelling: neither Dr. Rucker nor Howard Lee Miller has any "practical experience or knowledge of what physicians do." For this reason, the trial court clearly did not abuse its discretion in excluding the testimony of Dr. Miller.
We are of the opinion that unless the conduct complained of is readily ascertainable by lay persons, the standard of care must be established by medical testimony. "Medical testimony" means testimony by physicians or properly introduced medical treatises that are recognized as authoritative and standard works in the medical profession.
Although both Fisher and Miller are shown to be highly qualified experts in their fields of study, we cannot permit them to testify whether a medical doctor followed the proper standard of care in prescribing the drug Elavil. Neither was shown to be authorized to prescribe the drug. While their knowledge of the drug and its effect on the human body may or may not be greater than that of a medical doctor authorized by law to prescribe the drug, we cannot permit a nonphysician, who cannot legally prescribe a drug, to testify concerning the standard of care that should be exercised in the prescription of the drug.
Finding no applicable exceptions to the general rule that proof as to what is or is not proper practice, treatment, and procedure can be established only by expert medical evidence, we conclude, as did the trial court, that summary judgment was appropriate. We would point out that appellants made no attempt to introduce any evidence from another medical doctor regarding this case, and the defendant raised at every opportunity this failure of proof.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES, BEATTY, HOUSTON and STEAGALL, JJ., concur.
JONES, J., dissents.
ALMON and ADAMS, JJ., not sitting.
JONES, Justice (dissenting).
I agree with the Court's opinion that the expert testimony of the two nonphysician witnesses is not admissible to prove that the defendant/physician was negligent in the mere prescribing of the drug Elavil. Only another physician (a medical doctor) would be competent to testify whether Ms. Bell's symptoms, along with her general physical condition, warranted the Elavil prescription. The two health care providers whose testimony is here challenged cannot testify, for example, that Dr. Hart violated the proper standard of care in his choice of the drug Elavil as the appropriate treatment of his patient. Where, as here, however, the gravamen of the action is the alleged overdosage of the prescribed medication, the pharmacist is competent to testify as an expert, by reference to the same publication used for that purpose by the physician, that the dosage prescribed exceeded the maximum allowable dosage. For this reason, I respectfully dissent.
NOTES
[1] Pratt v. Stein, 298 Pa.Super. 92, 444 A.2d 674 (1982), is cited by the plaintiffs for the proposition that a pharmacologist is qualified to testify as an expert witness on the standard of care in the medical community as it relates to the prescription and the use and administration of prescription drugs. The pharmacologist in Pratt held a medical degree in addition to a post-doctorate degree in pharmacology and would be permitted to testify in Alabama under authority of Wozny v. Godsil, 474 So.2d 1078 (Ala.1985).